**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| SANINYANATA SMITH, | : | Case No. 3:16-cv-476 |
| Plaintiff, | : | |
| | : | |
| vs. | : | District Judge Walter H. Rice |
| | : | Magistrate Judge Sharon L. Ovington |
| NANCY A. BERRYHILL, | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I. Introduction

Plaintiff Saninyanata Smith brings this case challenging the Social Security Administration's denial of her application for Supplemental Security Income. She applied for benefits on September 27, 2013, asserting that she could no longer work a substantial paid job. Administrative Law Judge (ALJ) Gregory G. Kenyon concluded that she was not eligible for benefits because she is not under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #8), Plaintiff's Reply (Doc. #9), and the administrative record (Doc. #6).

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Kenyon's non-disability decision.

## II.    Background

Plaintiff asserts that she has been under a "disability" since September 27, 2013. She was forty-six years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. § 416.963(c). She has a high school education. *See* 20 C.F.R. § 416.964(b)(4).

### A.    Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Kenyon that she has bipolar disorder. (Doc. #6, *PageID* #99). She has difficulty interacting with other people—"they agitate me, I don't trust them because of all the things, trauma and things, I've been through. ..." *Id.* at 99-100. She also has "a lot" of anger and irritability. *Id.* at 99. Plaintiff gets into arguments with her mom, brother, son, grandkids, and neighbors. *Id.* at 100. She does not like the public and prefers to stay inside her house where she feels safe. *Id.* at 106. She estimated that she leaves approximately once per week. *Id*.

Since she was seven years old, Plaintiff has experienced paranoia and is "always thinking somebody [is] against me …." *Id.* at 102. She hears voices every day: "they just tell me to do things I know I shouldn't be doing." *Id.* at 107-08. She has five or six crying spells per day every day. *Id.* at 109. She has trouble concentrating and paying attention to things. *Id*.

Plaintiff's mental health problems sometimes lead her to hurt herself: "I'm so frustrated with all th[ese] mental things, hearing voices sometime[s], telling me to do stuff. So I got bruises sometime[s] from … hitting myself or … things like that. I cut holes in my head. … I take scissors and … I just cut …." *Id.* at 100-01. She has been doing it since she had a mental breakdown in 2009. *Id.* at 101. Plaintiff has thoughts of killing herself at least three times a week. *Id.* at 102-03. She has also had thoughts of killing her son. *Id.* at 104. She explained, "he has Tourette's. And I['ve] been taking care of him all his life … And he called me bitches and he been dogging me out for a very long time. Ever since he was small. … I just get tired of it … he's one of the people on my list if he didn't leave me alone, … I wanted to destroy him. …" *Id.* at 105. In a thirty-day period, Plaintiff generally has thoughts of hurting others twenty times. *Id*.

Doctors at Day-Mont prescribe medications for her but "[t]hey [have] been switching them around, … trying to figure out what's going wrong." *Id.* at 109. Because of the high turnover rate at Day-Mont, she has seen many different doctors and therapists. *Id.* at 109-10. She feels that she cannot "get the balance and order" that she needs. *Id.* at 110. She is attempting to switch to Mahajan Therapeutics. *Id*. Plaintiff's medications make her drowsy and she usually sleeps twelve hours per day. *Id.* at 112. "Once I take my medicine I'm drowsy, I can't function, I can't cook, I can't do things that I normally do when I'm not taking my medicine to take care of myself. I'm checking doors, I'm sleeping. I'm doing what I got to do, but then I'm up and I'm staggering." *Id*.

Plaintiff is not able to take care of her personal needs. *Id.* at 113. She sometimes goes an entire week without changing her clothes or bathing. *Id*. Care Source recently

3

assigned Plaintiff people to take care of her hygiene, help her cook, take her to the doctor, clean her house, and help her out. *Id.* at 97.

On December 15, 2014, Plaintiff fell in a pothole in a parking lot and injured her right hand and ankle. *Id.* at 95. She then had a nervous breakdown and needed to go to Kettering Hospital. *Id.* at 95-96. Her family-care physician recently gave her a sleeve to wear on her hand and referred her to a specialist. *Id.* at 116. Because of the injury, she cannot write or lift anything. *Id*.

Plaintiff also has problems with her bowels. *Id.* at 117. She recently had to be taken by ambulance to the hospital because her bowels "locked up." *Id*. She also experiences incontinence with accidents every day.

Plaintiff lived in a condo/apartment by herself but planned to move the Friday after the hearing. *Id.* at 96. She has a driver's license but is not able to drive because of her medication. *Id.* at 97. She has one son and three grandchildren. *Id.* at 96. She is not able to take care of her grandchildren. *Id.* at 111.

On a typical day, Plaintiff is "[h]ome, alone, watching TV, barely eating, taking my meds. I've got to eat a little something and drink something to do that. … I don't have a life." *Id.* at 115. When asked if she had any hobbies or things she liked doing, Plaintiff responded: "I love the lord, but when I was small I was witness to a preacher running over a little boy … and I asked the cop … 'What happened?' And he said, 'He was drunk.' And I heard that baby's body rolling up under that car, he drug him and so I love being in God's houses, but I don't trust … the people in there …." *Id.* at 114. She went to church three weeks before the hearing and enjoyed it. *Id*.

### B. Medical Opinions

#### i. Scott D. Shaw, M.D.

Dr. Shaw, Plaintiff's treating physician, completed interrogatories on August 28, 2015. *Id.* at 961. He indicated that he had treated her for atypical nevi, decreased hearing, arthralgias, vaginitis, climacteric, and a history of psychiatric disorder that is treated by her psychiatrist. *Id.* at 962. He opined that because of Plaintiff's significant psychological problems, she does not have the ability to be prompt and regular in attendance or the ability to withstand the pressure of meeting normal standards of work productivity and work accuracy without significant risk of decompensation or worsening of her impairments. *Id*. She cannot demonstrate reliability or complete a normal work day or work week without interruption from psychological and/or physically based symptoms and cannot perform at a consistent pace without unreasonable numbers and length of rest periods due to her psychiatric instability. *Id.* at 963.

Plaintiff has swelling, tenderness, and decreased strength and range of motion in her right wrist. *Id.* at 963, 966. She can frequently lift up to five pounds. *Id.* at 963. Further, her right-wrist swelling and tenderness affect her ability to handle, finger, feel, and push/pull. *Id.* at 965. Her psychological issues impair her abilities to see and speak. *Id*. Dr. Shaw found that she did not have the residual functional capacity to perform sedentary work. *Id.* at 967. He opined that Plaintiff is "unable to perform any significant work assignments due to psychiatric illness. She is followed by a psychiatrist. …" *Id*.

### ii.     Amparo Wee, M.D.

Dr. Wee, Plaintiff's treating psychiatrist completed a basic medical and medical functional capacity assessment on December 15, 2011. *Id.* at 618-21. Dr. Wee noted that Plaintiff's medical conditions include chronic depression and anxiety, paranoia, and mood swings. *Id.* at 920. "She also hears voices who sometimes tell her to do things." *Id*. The history of these problems dates back to when Plaintiff was molested when she was seven years old. *Id.* at 619-20. She "was treated differently from other children due to her learning disability." *Id.* at 619.

Plaintiff is markedly limited in her ability to understand and remember detailed instructions and to interact appropriately with the general public. *Id.* at 618. She is moderately limited in many areas, including her ability to carry out very short and simple instructions; to sustain an ordinary routine without special supervision; and to ask simple questions or request assistance. *Id*. Dr. Wee indicated that these limitations are expected to last twelve or more months. *Id*.

Dr. Wee opined that Plaintiff's health status was improving with treatment, and "she is motivated to continue [with] her treatment and meds." *Id.* at 619-20. However, Plaintiff's judgment is impaired, and she has poor coping skills and poor self-esteem. *Id*. Dr. Wee concluded that Plaintiff is unemployable. *Id.* at 618.

### iii.     Roseann Umana, Ph.D., & Tonnie Hoyle, Psy.D.

Dr. Umana reviewed Plaintiff's records on January 14, 2014. *Id.* at 159-67. She found that Plaintiff had two severe impairments—anxiety disorder and affective disorder. *Id.* at 163. She has a mild restriction of activities of daily living, moderate difficulties in

6

maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation. *Id*. Dr. Umana's mental residual functional capacity (MRFC) was "an adoption of the ALJ MRFC dated [August 1, 2012]. The MRFC is being adopted under AR [(Acquiescence Ruling)] 94-4 (Drummond Ruling)." *Id.* at 165.

On May 5, 2014, Dr. Hoyle reviewed Plaintiff's records and affirmed Dr. Umana's assessment. *Id.* at 169-80.

### III. <u>Standard of Review</u>

The Social Security Administration provides Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. § 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record

7

contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV. <u>The ALJ's Decision</u>

As noted previously, it fell to ALJ Kenyon to evaluate the evidence connected to Plaintiff's application for benefits. He did so by considering each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 416.920. He reached the following main conclusions:

8

Step 1: Plaintiff has not engaged in substantial gainful employment since September 27, 2013.

Step 2: She has the severe impairments of bipolar disorder and post-traumatic stress disorder.

Step 3: She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4: Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "a full range of work at all exertional levels, including heavy/very heavy work, subject to the following limitations: (1) limited to performing unskilled, simple, repetitive tasks; (2) occasional contact with co-workers and supervisors; (3) no public contact; (4) no fast-paced production work or jobs involving strict production quotas; (5) no assembly line work; and (6) limited to performing jobs in a relatively static work environment in which there is very little, if any change in the job duties or the work routine form one day to the next."

Step 4: She is unable to perform any of her past relevant work.

Step 5: She could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 74-82). These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 82.

## V. Discussion

Plaintiff contends that the ALJ failed to give appropriate weight to her treating physicians. She also argues that the ALJ erred in finding that her pain complaints were not credible. The Commissioner maintains that substantial evidence supports both the ALJ's evaluation of the opinion evidence and Plaintiff's subjective complaints.

9

### A. Medical Opinions

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id*. (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to

any subsequent reviewer the weight given and the reasons for that weight. *Id*. Substantial evidence must support the reasons provided by the ALJ. *Id*.

ALJ Kenyon assigned the opinions of Plaintiff's treating physician, Dr. Shaw, little weight. (Doc. #6, *PageID* #78). He provided two reasons. First, the ALJ found Dr. Shaw's opinion was "internally inconsistent: the physician reported that [Plaintiff] would be limited to a reduced range of light work, but then stated that [she] would be unable to perform either light or sedentary work." *Id.* Second, he concluded Dr. Shaw's opinion was "unsupported by the medical evidence: there is no evidence of a chronic physical impairment that would more than minimally affect [Plaintiff's] ability to perform basic work-related functions[.]" *Id.* (citing Soc. Sec. R. 96-2p).

Substantial evidence does not support the ALJ's conclusion that Dr. Shaw's opinion was internally inconsistent. Dr. Shaw indicates that Plaintiff has several mental and physical limitations. For example, he indicates that she cannot be prompt and regular in attendance or demonstrate reliability because of her psychological issues and instability. *Id.* at 962-63. He further opined Plaintiff could frequently lift up to five pounds, stand for two hours at a time for a total of eight hours, and sit for two hours at a time for a total of eight hours. *Id.* at 963-64. Then, Dr. Shaw checked "NO" when asked, "Does claimant have the residual functional ability on a sustained basis (in an eight hour work day) to do: Sedentary work; that is, lift 10 lbs. maximal/or carry such articles as small tools. Such work involves primarily sitting but the individual can sit/stand and walking/standing is required only occasionally." *Id.* at 967. These opinions are not inconsistent. If Plaintiff can *only* lift five pounds frequently, then she cannot lift ten

pounds. Accordingly, the fact that Dr. Shaw indicated Plaintiff can only lift five pounds frequently is consistent with his response that Plaintiff cannot perform sedentary work.

The Commissioner contends that Dr. Shaw's statement—"She is followed by a psychiatrist. Please request psych input from them if needed"—means that "Dr. Shaw did not purport to include psychiatric limitations in his opinion." *Id.* at 967; Doc. #8, *PageID* #1110. But, the Commissioner overlooks or ignores that Dr. Shaw first noted, "Unable to perform any significant work assignments due to psychiatric illness"—an obvious opinion on Plaintiff's psychiatric limitations. (Doc. #6, *PageID* #967). Further, Dr. Shaw provided several psychiatric limitations at the beginning of his opinions— limitations that he attributed to her psychiatric illnesses. If Dr. Shaw was not purporting to include psychiatric limitations, then he likely would not have provided his opinion on Plaintiff's psychiatric limitations.

The ALJ also assigned the opinions of Plaintiff's treating psychiatrist, Dr. Wee, little weight. *Id.* at 78-79. Looking first at the Basic Medical Form, the ALJ found that Dr. Wee "provided no objective support as to why [Plaintiff] would be unemployable, and there is no evidence of any physical impairment that would affect her ability to engage in work activity[.]" *Id.* at 78 (citation omitted). Turning to Medical Functional Capacity Assessment, the ALJ found that Dr. Wee's opinion was "inconsistent with her treatment records, which showed a positive response to treatment[.]" *Id.* at 79 (citations omitted). Because Dr. Wee completed both forms on the same day, it is logical to consider the forms together.

The ALJ's finding that Dr. Wee did not provide objective support for her opinion ignores the realities of mental illness. It can be considerably more difficult to substantiate psychiatric impairments by objective laboratory testing:

> [W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques.

*Blankenship v. Bowen,* 874 F.2d 1116, 1121 (6th Cir. 1989) (citing *Poulin v. Bowen,* 817 F.2d 865, 873-74 (D.C. Cir. 1987), quoting *Lebus v. Harris,* F.Supp. 56, 60 (N.D. Cal. 1981)).

In this case, Dr. Wee did identify her diagnoses and observations, and there are no reasons to question her diagnostic techniques. In her assessment, she noted that Plaintiff has "chronic depression and anxiety along [with] paranoia and mood swings. She also hears voices who sometimes tell her to do things." (Doc. #6, *PageID* #620). She noted that Plaintiff was sexually molested when she was seven years old and was treated differently from other children because she had a learning disability. *Id.* at 619. Further, Dr. Wee opined that Plaintiff's "judgment is impaired" but "she is motivated to continue [with] treatment and meds." *Id.* at 619.

Dr. Wee's treatment notes support her assessment. For example, in August 2011, she notes that Plaintiff had racing thoughts, a blunted affect, anxious mood, pressured speech, auditory hallucinations, and persecutory delusions. *Id.* at 500-02. Plaintiff's

13

more recent treatment notes also support Dr. Wee's assessment. Margaret Barker, LSM, noted in December 2014 that Plaintiff's demeanor was labile, hostile, and depressed; her eye contact was intense; her activity was agitated; and her speech was pressured and paranoid. *Id.* at 666. Ms. Barker noted, "[Plaintiff] shares she is 'losing it', fears she 'might hurt or harm someone', can't tolerate being around anyone. [Plaintiff] irritable, asking to go to the hospital. Some paranoia observed…." *Id.* at 670. In June 2015, Plaintiff's psychiatrist, Dr. Peter Ramirez, noted that Plaintiff reported she was "struggling with psychosocial stressors. … Mood variable. Much anxiety. …" *Id.* at 953. He observed that she had rapid speech and a depressed mood. *Id.* at 955-56. Plaintiff met with a new provider, Misty McDowell, registered nurse practitioner, in September 2015. *Id.* at 1045. Ms. McDowell noted that Plaintiff's demeanor was hostile, her mood was irritable, her affect was blunted, her eye contact was poor, she was agitated, and her speech was loud and rapid. *Id.* at 1048. She opined Plaintiff was experiencing flight of ideas, paranoid delusions, and circumstantial thought associations. *Id.* She was guarded, had poor attention, concentration, insight, and judgment. *Id.*

The ALJ's finding that Dr. Wee's opinion is inconsistent with Plaintiff's positive response to treatment is puzzling given that Dr. Wee only indicated in her assessment that Plaintiff's health status was "Improving With [Treatment]." *Id.* at 620. In other words, despite Plaintiff's improvement with treatment, Dr. Wee nonetheless concluded Plaintiff's impairments inhibit her ability to do work-related tasks.

Finally, the ALJ also found that both forms used by Dr. Wee are "used by the various county welfare departments to determine eligibility for Medicaid benefits. They

14

were not designed, nor were they ever intended to be used, to determine eligibility for disability benefits under the Social Security Act." *Id.* at 78-79. As this Court previously held, "[t]o reject such forms because they were prepared as part of Plaintiff's application for Medicaid benefits unduly prejudices impoverished claimants whose physicians may be unwilling to complete multiple redundant opinion forms for different government agencies." *Clemmer v. Comm'r of Soc. Sec.,* 3:13cv40, 2013 WL 6158372, at *12 (S.D. Ohio Nov. 25, 2013) (Black, D.J.); *Shank v. Colvin*, No. 3:14CV89, 2015 WL 1970394, at *7 (S.D. Ohio May 1, 2015), *report and recommendation adopted,* 2015 WL 2452217 (S.D. Ohio May 19, 2015) (Rice, D.J.). Accordingly, it was improper for the ALJ to rely on such a fact when determining the amount of weight to provide Dr. Wee's opinions. *Id.* at *28 ("[T]he fact that [the treating physician's] opinion was prepared as part of an application for county welfare benefits cannot stand as a reason to discredit the opinion.").

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[2]

**B.     Remand**

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*,

---

[2] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to

determine anew whether Plaintiff was under a disability and whether her application for Supplemental Security Income should be granted.

**IT IS THEREFORE RECOMMENDED THAT**:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Saninyanata Smith was under a "disability" within the meaning of the Social Security Act;

3. This matter be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4. The case be terminated on the Court's docket.

January 23, 2018                                    *s/Sharon L. Ovington*
                                                    Sharon L. Ovington
                                                    United States Magistrate Judge

# NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).